UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRIS MCTAMMANY and NOEL THOMPSON,

Plaintiffs,

v.

FOUNDATION CAPITAL PARTNERS L.P., DEAN S. BARR, JOSEPH E. MEEHAN, and TOM WARD,

Defendants.

COMPLAINT
AND JURY DEMAND

CIVIL ACTION NO.
________cv________

September 26, 2013

Plaintiffs Chris McTammany and Noel Thompson (collectively, the "Plaintiffs"), by their attorneys, Reed Smith LLP and Wiggin and Dana LLP, allege as follows:

## PRELIMINARY STATEMENT

1. This action arises from the Defendants' wrongful refusal to pay the Plaintiffs' for raising funds for the Defendants' private equity fund after the Defendants exploited the Plaintiffs' labor, financial contacts, and goodwill for approximately nine months.

2. In October 2012, Hedge Fund Alert reported that Defendant Foundation Capital Partners, L.P. ("Foundation Capital") was a "[n]ewcomer to the seeding business seeking to raise $1.5 billion . . . [to] take 20% stakes in 8-10 established funds" and had "yet to make [its] first investment." The article also reported that Defendant Tom Ward had been hired in May 2012 as "head of fund raising."

3. Shortly before then, in or about September 2012, the Defendants solicited and hired the Plaintiffs to find prospective investors willing to commit substantial amounts of capital for Defendant Foundation Capital to use as operating capital and to purchase stakes in established hedge funds. In particular, the Defendants wanted the Plaintiffs to provide and develop their existing personal and working relationships with potential investors to raise capital for the Defendants' private equity fund. In exchange, the Defendants promised to compensate the Plaintiffs for their services by paying them a two-percent commission on the total capital an investor they introduced to the Defendants committed to invest in Foundation Capital. In addition, the Defendants agreed to pay the commission in installments over a specific term. The Defendants also assured the Plaintiffs that Foundation Capital would "paper" their commission agreement to comply with any applicable securities regulations and to ensure the Plaintiffs were properly paid for their services. Accordingly, the Plaintiffs accepted the Defendants' offer and immediately began working for the Defendants and introduced several prospective investors to the Defendants.

4. The Plaintiffs' hard work bore fruit when a prospective investor, Pacific Northern Capital ("PNC"), a global private investment firm seeking investment opportunities for high net worth families and individuals, invested $5 million in Defendant Foundation Capital, and expressed a commitment to invest $1 billion and to source and commit an additional $3 billion or more in funding for Foundation Capital.

5. For nine long months, the Plaintiffs continually worked to ensure that Foundation Capital and PNC closed their investment deal. The Plaintiffs emailed, called, texted, and personally met with individuals at PNC and Foundation more than three

hundred times during this nine month period regarding the proposed deal between Foundation Capital and PNC.

6. Throughout this period, the Defendants used the Plaintiffs to support their fundraising efforts; directed them to act on behalf of Foundation Capital on numerous occasions; and, repeatedly – both orally and in writing – promised to pay the Plaintiffs the promised two-percent commission for investors the Plaintiffs referred to the Defendants. For example, when PNC indicated it would make a billion dollar commitment to Foundation Capital, Defendant Tom Ward called Plaintiff Chris McTammany and assured him that such an investment would "mean twenty million in commission for you."

7. The Defendants, however, changed their position, in or about June 2013, when PNC made a $5 million dollar investment in Foundation Capital's general partnership and expressed a commitment to invest $1 billion, and to source and commit additional billions for Foundation Capital. With cash in hand and after successfully stalling to "paper" their agreement with the Plaintiffs, the Defendants then refused to pay the two-percent commission due to the Plaintiffs on any of the funds PNC had invested or would source or commit to invest in Foundation Capital.

8. Instead, in a "bait-and-switch" maneuver one would not expect from a business or individuals raising billions of dollars from prospective investors, the Defendants wanted to "hook" the Plaintiffs into raising more money for the Defendants by now offering to pay them a two-percent commission on any **future** investments the Plaintiffs would raise for Foundation Capital.

9. Because the Defendants have repudiated their promises and refused to pay the Plaintiffs the agreed two-percent commission, the Plaintiffs are compelled to bring this suit to recover the commissions they are owed for securing PNC's $5 million investment for the Defendants. In addition, because the Defendants have refused to pay the promised two-percent commission and PNC has expressed a commitment to invest $1 billion and more with the Defendants, the Plaintiffs seek a declaratory judgment that the Defendants owe them a two percent commission on (i) investments raised and sourced through PNC, which, upon information and belief, are expected to exceed $4 billion, and (ii) investments made by any other investor that the Plaintiffs introduced to the Defendants, as well as any investments derived from such introductions.

## JURISDICTION AND VENUE

10. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction, as the parties are citizens of different states, and the amount in controversy exceeds the sum of $75,000.

11. Venue is proper in this District pursuant to 28 U.S.C 1391(b)(1) because practically all of the Defendants reside in this District and all are subject to personal jurisdiction in this District.

## PARTIES

12. Plaintiff Chris McTammany is an individual residing in Huntington, New York, whose primary business is executive recruiting for hedge funds.

13. Plaintiff Noel Thompson is an individual residing in New York, New York, who manages a New York hedge fund.

14. Defendant Foundation Capital Partners L.P. is a limited partnership whose principal place of business is located in Greenwich, Connecticut.

15. Defendant Dean S. Barr is a partner in Foundation Capital, who upon information and belief, resides in Greenwich, Connecticut.

16. Defendant Joseph E. Meehan is a partner in Foundation Capital, who upon information and belief, resides in Greenwich, Connecticut.

17. Defendant Tom Ward is a partner in Foundation Capital, who upon information and belief, resides in Houston, Texas.

18. At all times relevant to the facts alleged in this Complaint, Defendants Barr, Meehan, and Ward were acting on their own behalf and/or as agents of Defendant Foundation Capital. As a result, Defendants Barr, Meehan, and Ward are individually liable for the claims herein and Defendant Foundation Capital is directly and vicariously liable for the breached agreements, torts, and damages committed by its partners and agents.

## STATEMENT OF FACTS

19. In 2010, Dean Barr and Joseph Meehan formed Foundation Capital, a private equity fund whose investment strategy focused on buying minority interests in the general partnerships of hedge funds and profiting from both the performance of the fund and fees earned by each hedge fund.

20. Barr serves as the managing partner of Foundation Capital and Meehaan serves as the Chief Operating Officer. They subsequently hired Defendant Tom Ward to serve as a partner and head of fund raising in or about May 2012.

21. Despite their collective seventy-six years of Wall Street experience, for over three years, the Defendants had difficulty raising the capital needed to fund their new venture, resulting in the highly publicized loss of potential deals. For example, on July 18, 2013, the Wall Street Journal reported that a 2011 deal to buy a minority interest in Millennium Partners, a fourteen-billion dollar hedge fund, fell through because the Defendants did not have sufficient funds to complete the deal. As a result, and as is commonly done by private equity funds seeking to raise new capital, the Defendants sought out third-parties to work on finding prospective investors who could commit to funding Foundation Capital.

22. In that regard, on or about September 17, 2012, Defendant Tom Ward called Chris McTammany to solicit him to help the Defendants raise capital from prospective investors and arranged for a personal meeting to agree on the details.

23. On September 20, 2012, prior to meeting in person, Ward sent McTammany a one page "teaser" which described the goals and strategy of Foundation Capital, including its effort to raise $1.5 billion to invest in approximately ten hedge funds with at least $5 billion in assets under management and its plan to take Foundation Capital public.

24. On September 21, 2012, McTammany, his assistant Daniel Lennon, and Ward met in person. Ward gave McTammany a detailed description of Foundation's

strategy, and offered to pay McTammany the industry standard two percent commission on any funds raised for Foundation Capital, which would be paid out over three years. Ward explained to McTammany that if, for example, he raised $100 million, he would be paid $2 million, or approximately $650,000 per year for three years. Throughout the meeting, both McTammany and Lennon took detailed notes of Ward's proposal, including his offer to pay a two-percent commission. At all times during the meeting, Ward watched McTammany and Lennon write down his offer, and when asked by McTammany or Lennon to confirm any aspect of the offer, Ward did so. McTammany accepted the offer and immediately began identifying and contacting prospective investors for Foundation Capital.

25. After the meeting, McTammany emailed Ward, telling him that he had a "few solid ideas." Three days later, McTammany introduced Ward to Kelly Holowaty, the Business Development Director at Pacific Northern Capital ("PNC"), a global private investment management firm interested in learning more about Foundation Capital. Prior to this introduction, Plaintiff Noel Thompson introduced Kelly Holowaty and PNC to McTammany as a prospective investor. Ward thanked McTammany and promised to "keep [him] in the loop."

26. The next day, Ward and Holowaty spoke over the phone, and set up a conference call for the following day that would include the other Foundation Capital partners, Dean Barr and Joe Meehan.

27. On September 26, 2012 McTammany, Holowaty and the Foundation Capital team had a conference call. The Defendants discussed their individual

backgrounds, some of the potential acquisitions in their pipeline, and their plan to take Foundation Capital public. Holowaty told the Defendants about PNC's investment goals, including its interest in alternative investments like Foundation Capital. Holowaty agreed to have a follow-up call after receiving more information from the Defendants. McTammany made clear to the Defendants that Plaintiff Noel Thompson had introduced PNC and Holowaty to McTammany, and that McTammany and Thompson would split the commission for finding PNC as an investor for the Defendants.

28. After the call, Ward emailed McTammany to tell him that it was a "great call" and that it "sounds like a good fit." McTammany responded by offering to do "anything else" to help the process along. Later that night, McTammany wrote a lengthy email to the Defendants, outlining a strategy to help secure an investment from PNC.

29. As the Plaintiffs developed PNC as a prospective investor for Foundation Capital, McTammany continued to work on finding and introducing additional prospective investors for the Defendants.

30. Over the next few weeks, McTammany regularly worked on developing and strengthening the business relationship between PNC and the Defendants, including personally meeting with Holowaty at his home in Newport Beach in the first week of October 2012 to discuss Foundation Capital, arranging personal meetings between Holowaty and the Defendants on multiple occasions, and assisting Foundation Capital in communicating with Holowaty about his prospective investment.

31. As the Defendants' relationship with PNC and Holowaty developed, the Defendants emailed McTammany multiple times a day to provide him with updates on the

Defendants' efforts to obtain an investment from PNC and to seek the Plaintiffs' input and help with ensuring that PNC continue to move forward with its potential investment. McTammany also received most e-mail communications between PNC and the Defendants during the investment development period.

32. For example, on October 12, 2012, after their meeting in California, Ward sent an email to Holowaty, with a copy to McTammany, stating that the Defendants were "very excited at the prospect of having you and Pacific Northern partner with us by investing in our fund and sincerely believe that it would be a great fit."

33. The same day, Ward called McTammany to discuss the possibility that PNC would invest a billion dollars with the Defendants, and told McTammany that such an investment would "mean twenty million in commission for you."

34. On October 17, 2012, Ward sent an email update to McTammany about the Defendants' negotiations with PNC, stating that "Kelly [Holowaty] wants to begin due diligence next week on FCP to be able to invest $500mm onshore account and $500mm offshore account if all checks out."

35. With PNC's investment becoming increasingly certain, the Defendants presented McTammany a structure to pay the commissions owed for procuring PNC's investment that sought to assure the Plaintiffs that the Defendants were complying with any applicable securities regulations. In particular, Ward told McTammany to register as a securities broker, explaining that "my COO Joe Meehan will want you to take the series 7 and we will get someone to sponsor you so that you can get commish."

36. In the same email, Ward went on to explain that Dean Barr, the managing partner, joked that "we'd hire him [i.e., McTammany] for $1 million a year instead of the commission!!"…. interested ?? …. Unlikely!!"

37. The Defendants knew it was "[u]nlikely" that McTammany would agree to a yearly salary of $1 million because the Plaintiffs stood to earn two percent of PNC's expected $1 billion investment, which amounted to $20 million.

38. On October 24, 2012, Meehan sent an email to McTammany about paying the promised two-percent commission, asserting that Foundation Capital could find "a few friendly BDs [broker-dealers] to deal with your license – you will need them to sponsor your Series 7….As I thought, when it comes to payment structuring, that would be between the two of you. Still looking into the split fee scenario."

39. In early November 2012, Ward stressed to McTammany that he should focus on "reeling in Kelly [at PNC]."

40. Throughout the rest of the month, conversations continued between PNC, McTammany and the Defendants. On November 17, 2012, after a due diligence call between PNC and the Defendants, Ward wrote McTammany to ask for "any insights you can give us without spooking Kelly." On November 26, 2012, Holowaty texted McTammany to assure him the discussions are "going well with Dean." Later, McTammany emailed Ward to tell him that "he spoke to Kelly tonight, and he seems quite positive with regard to FCP [Foundation Capital Partners]." Ward wrote back the next day, "Thx Chris… For selfish reasons… I wish he could commit to several hundred right now…. Is your impression that anywhere near a billion is still possible?"

41. On or about December 12, 2012, as discussions with PNC developed and the scope of their potential investment grew to more than a billion dollars, Dean Barr and McTammany discussed the commissions due. Barr reiterated the Defendants' previous commitment to pay the two percent commission over three years. Barr also presented different options for paying the compensation due. One option was to pay the full commission in cash. Another option was to pay half the commission in cash and half in the form of general partnership shares in Foundation Capital. Barr explained that the cash and equity option provided significantly more upside potential than an all cash deal because Foundation Capital eventually planned to go public.

42. Barr sought to entice the Plaintiffs into raising more capital for the Defendants by reiterating to McTammany that the two percent commission was scalable, which meant that if the Plaintiffs raised $4 to $5 billion via PNC's network, they would be owed $80-$100 million in commissions. Barr also told McTammany that "if the money comes in - the resulting commission would be life changing." McTammany responded that it would be more "life changing for [Barr], than [McTammany], as it puts [Barr] on the path to becoming a billionaire in a few years!"

43. In early 2013, the Defendants and McTammany worked diligently to ensure Foundation Capital and PNC finalized the terms of PNC's investment. On or about January 7, 2013, Barr directed McTammany to "get a better sense [of PNC's] timing" with respect to its investment. The next day, McTammany spoke to Holowaty, encouraging him to close the deal with the Defendants.

44. At the Defendants' request, on January 9, 2013, McTammany met with Ward, Barr, and Meehan at their offices in Greenwich, Connecticut, to discuss the timing and potential size of PNC's near-term investment. Barr informed McTammany that PNC was the only tangible "anchor investor" in the pipeline, and therefore, Barr needed McTammany's help in obtaining a commitment letter from PNC as soon as possible. McTammany followed up with PNC and, on January 14th, Holowaty sent a text to McTammany, stating "this will get done, its [sic] just a matter of timing."

45. On January 23, 2013, Ward sent an email to McTammany to update him on Barr and Holowaty's discussions and stating that Barr was "becoming more convinced it can happen." McTammany responded that "all reports back are quite positive" and that "the proper amount of pressure is being applied to Kelly." McTammany also agreed to speak to Holowaty "later today to keep him focused on executing."

46. A week later, Ward wrote to McTammany to inform him that PNC had committed to a $500 million investment in the fund as a limited partner, and a $ 5 million investment to purchase shares of the general partnership. In addition, Holowaty committed to attempting to source $4 billion over time. Ward concluded his email by writing: "Can't thank you enough, Chris. Very exciting for all involved… including you." Holowaty was very excited because he knew the Plaintiffs were due a substantial commission on the capital raised through investors, such as PNC, that the Plaintiffs introduced to the Defendants.

47. Over the next few months, McTammany's regular involvement diminished as the lawyers on both sides attempted to finalize the terms of PNC's deal with Foundation

Capital. Nevertheless, on February 13th, McTammany wrote Ward, reminding him that he is "still very much on call" in case he was needed. Ward wrote back: "Sounds good… will also push Dean **for more clarification of comp beyond $1b**…. too many moving pieces in the last few days…" (emphasis added).

48. Plaintiffs' compensation for funds raised **beyond** $1 billion had to be clarified by Ward because Ward had agreed to pay McTammany two-percent in cash for any raised capital and Barr had presented different payment options – either entirely in cash or in a combination of cash and partnership interests – for raised capital beyond $1 billion when McTammany and Barr spoke on or about December 12, 2012.

49. The same day, McTammany wrote back that the distinction in commission payments between the first billion and additional billions raised was inconsistent with their previous agreement because "from the onset there was never a cap discussed," and imposing an "arbitrary cap on $1bn" after PNC indicated that it may invest more than $1 billion would be unfair. Ward acknowledged McTammany's point, responding: "Hear ya."

50. Despite McTammany's reservations, he emphasized to Ward that "for now" it was more important to focus on getting "the money in the door."

51. McTammany kept to his word, and for the next three months, focused exclusively on helping the Defendants consummate the deal with PNC. He checked in with the Defendants on a nearly daily basis to get updates, and provide assistance in dealing with Holowaty. For example,

a. On March 12, 2013, McTammany wrote to Ward informing him that he received a text from Holowaty saying "everything is good with Foundation, will keep you posted."

b. On March 19, 2013, Ward wrote McTammany to tell him that the Defendants and PNC hoped "to close this week." He concluded his email to McTammany by saying, "Fingers crossed. Thanks again for your help." McTammany wrote back "You and Dean and I have been wrangling the whale onto the boat these past few months."

c. On March 24, 2013, Ward emailed McTammany to tell him that it was "deadline time" and to "stay on" Holowaty. McTammany wrote back that he told Holowaty to "shit or get off the pot."

d. On April 9, 2013, McTammany emailed Ward to inform him that Holowaty sent him a note saying that he was "wrapping up agreement today / tomorrow then ready to close."

e. On April 20, 2013, McTammany wrote to Ward to tell him that Holowaty sent him a text saying that he was "working on getting this done asap."

f. On April 25, 2013, Ward wrote to McTammany that there was "some progress" and that he was "cautiously optimistic we can put trade on the tape soon." McTammany responded that Holowaty expects "the deal will get finalized this week."

52. In early May 2013, as the deal between PNC and Foundation Capital moved toward closing, McTammany wrote to Ward to arrange a call with Ward, Meehan, McTammany and the broker-dealer that McTammany was asked to recently join in order to receive the promised two-percent commission payment. During the call, on or about May 8, 2013, Meehan and Ward described Foundation Capital's business model, its plans to go public and the status of PNC's imminent capital commitment.

53. In early June 2013, Foundation Capital believed that the PNC deal might fall apart, despite Holowaty's continued insistence to McTammany and Foundation Capital that the deal would close. On June 7th, Ward sent an email to McTammany, complaining that PNC was "still bobbing and weaving" and that the Defendants "should have screened this guy better." In response, McTammany reassured Ward that "I do believe the money will arrive."

54. Nevertheless, the Defendants again asked the Plaintiffs to work on finding additional prospective investors to prepare for the possibility that the PNC investment may not close. At the Defendants' request and insistence, the Plaintiffs met with the Defendants – twice on the same day – to discuss investor prospects and their likelihood of investing $5 million in operating capital and more than $1 billion with the Defendants. The Plaintiffs understood that these substitute investors were critical to the Defendants because the pending PNC capital commitment was used as leverage to seek capital commitments from other investors and the Defendants appeared desperate for the operating capital.

55. On June 17, 2013, before the PNC deal with Foundation Capital was expected to close, McTammany and Thompson asked Ward about signing a "formal

agreement" to arrange for payment through the broker-dealer the Defendants had proposed.

56. Two days later, on June 19, 2013, Ward sent the Plaintiffs proposed terms "**under which we would engage you for new [sic] any <u>new</u> LP commitment or GP capital that you would source.**" (emphasis in original). The Defendants proposed to pay the Plaintiffs two percent in cash of General Partner investments they raised, or one percent if paid as a share of the General Partnership. For limited partnership investments, the Defendants offered to pay in cash two percent of the assets raised as the commitment was drawn down, or, one percent if paid as a share of the General Partnership.

57. With respect to the $1 billion that the Defendants expected to receive from PNC, Ward repudiated the Defendants' agreement with the Plaintiffs, asserting that "**I cannot give you a concrete payout of what you will get paid for PNC coming back and signing and funding.**" (emphasis in the original).

58. Prior to this communication from Defendant Ward, the Defendants repeatedly guaranteed and reassured the Plaintiffs that the Defendants would pay the Plaintiffs the promised two percent commission for any money raised for the Defendants. The Defendants' agreement to pay the Plaintiffs was memorialized in written notes, multiple e-mail exchanges, and affirmed and ratified by the Defendants on multiple occasions, including on:

a. September 21, 2012: McTammany and Ward initially met to discuss raising money for the Defendants and Ward promised to pay 2 percent of all money raised for the Defendants, payable in equal installments over three

years. McTammany and his assistant took notes reflecting Ward's promised terms and Ward acknowledged that the offer terms were accurate during the meeting.

b. October 12, 2012: When a $1 billion investment from PNC looked likely, Ward called McTammany to tell him such an investment would "mean twenty million in commission for you."

c. October 17, 2012: Ward reiterated his offer to pay the Plaintiffs a commission in writing in an email to McTammany where Ward told McTammany that he would need to take his Series 7 exam and find a sponsor "so that you can get commish [i.e., commission]."

d. December 12, 2012: McTammany had a call with Dean Barr, who reaffirmed that the Defendants would pay McTammany two percent of all funds raised for the Defendants and discussed various payment options.

e. February 13, 2013: Ward again confirmed Defendants' agreement regarding the commission to be paid on the first billion when he agreed to seek "clarification of comp beyond $1b" and McTammany reminded him that "from the onset there was never a cap discussed." Ward conceded that McTammany was correct, responding: "Hear ya."

59. Finally, on June 21, 2013, nine long months after the Plaintiffs introduced PNC to the Defendants, PNC wired four out of five million dollars to the Defendants in order to acquire interests in the Defendants' general partnership. The following Monday,

PNC wired the remaining one million. PNC's $5 million investment was intended to demonstrate it remained committed to investing with the Defendants and was supposed to precede a $1 billion capital commitment to the Defendants shortly thereafter.

60. On July 18, 2013, at or around the time that PNC was expected to make the $1 billion capital commitment to the Defendants, the Wall Street Journal reported, in an article entitled "Investors Sow Seeds for Hedge Funds," that Foundation Capital had recently raised funds, "including $1 billion from a sovereign wealth fund."

61. For a nine-month period, the Plaintiffs devoted substantial amounts of time and personal resources to ensure that the Defendants and PNC consummated their investment deal. On numerous occasions during this time period, the Defendants' asked McTammany to speak to, or otherwise intervene with PNC to ensure that PNC remained committed to investing with the Defendants, and the Plaintiffs repeatedly did so with apparent success when PNC invested $5 million with the Defendants and expressed a commitment to invest substantially more funds. To date, Plaintiffs have been unable to confirm – despite repeated requests to Defendants and PNC – what agreements have been signed by PNC or any other investors introduced or sourced by the Plaintiffs or PNC, and thus are unable to establish, prior to discovery, the full extent of the commissions they are due from the Defendants.

62. In sum, the Plaintiffs fully performed their obligations to the Defendants, by introducing several prospective investors to the Defendants, securing at least a $5 million in investments from PNC, and obtaining additional commitments from PNC to invest or source and commit additional billions for the Defendants, yet the Defendants have refused

to pay the agreed two-percent commission for any funds the Plaintiffs worked on raising for the Defendants.

## CAUSES OF ACTION

Count One – Declaratory Judgment
(Against All Defendants)

63. A justiciable controversy exists because the Defendants have repudiated their promise to pay the Plaintiffs the two-percent commission on all investments in Defendants' funds that came from investors that Plaintiffs found for the Defendants.

64. The Plaintiffs introduced PNC as an investor to the Defendants and PNC has expressed a commitment to investing or sourcing at least an additional $ 4 billion in investments for the Defendants' fund.

65. The Plaintiffs lack an adequate remedy at law to enforce the payment of the two-percent commission it will be owed on the future investments committed or sourced through PNC.

66. Therefore, the Plaintiffs are entitled to a judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants are obligated to pay the Plaintiffs a two-percent commission on all investments and capital commitments made to the Defendants from investors introduced or sourced by the Plaintiffs or PNC, including, but not limited to, all investments that PNC will make, facilitate, or cause to be made in the Defendants' fund.

Count Two – Breach of Contract
(Against All Defendants)

67. The Plaintiffs restate and re-allege the foregoing paragraphs of this Complaint as if fully set forth herein.

68. The Plaintiffs and Defendants entered into a contract in which the Plaintiffs would secure investments for the Defendants and the Defendants would pay the Plaintiffs a two percent commission on the funds committed by investors they found for the Defendants.

69. The Plaintiffs performed their part of the bargain by finding and cultivating PNC, who has, either directly or indirectly, made at least a $5 million investment with Defendant Foundation Capital.

70. On or about June 19, 2013, the Defendants breached the contract by refusing to pay the Plaintiffs the promised commission for the funds successfully raised from PNC.

71. As a result, the Plaintiffs have been damaged in an amount to be determined at trial, but not less than $100,000.

Count Three – Unjust Enrichment
(Against All Defendants)

72. The Plaintiffs restate and re-allege the foregoing paragraphs of this Complaint as if fully set forth herein.

73. For nine months, the Plaintiffs tirelessly worked on finding investors for the Defendants' fund. On numerous occasions, the Defendants acknowledged and praised the

Plaintiffs' efforts and promised to pay the Plaintiffs a commission of two percent of the amount they raised for Foundation Capital from prospective investors.

74. The Plaintiffs succeeded in their efforts when PNC made a $5 million investment in the Defendants' general partnership and expressed a commitment to invest or source additional funds for Defendant Foundation Capital.

75. After securing the PNC investment, the Defendants, without any justification, reneged on their agreement to pay the Plaintiffs a two percent commission.

76. The Defendants' repudiation of their promise has damaged the Plaintiffs in an amount to be determined at trial, but not less than $100,000.

<u>Count Four</u> – <u>Promissory Estoppel</u>
(Against All Defendants)

77. The Plaintiffs restate and re-allege the foregoing paragraphs of this Complaint as if fully set forth herein.

78. The Defendants clearly and unambiguously promised to pay the Plaintiffs a two percent commission on funds they raised for the Defendants. Such promises were made on numerous occasions from in or about the Fall of 2012 to the Summer of 2013.

79. The Plaintiffs helped secure a $5 million investment from PNC for the Defendants.

80. The Plaintiffs reasonably relied on the Defendants' promises of compensation before spending nine months working to secure PNC as an investor for the Defendants.

81. The Defendants' repudiation of their promise has damaged the Plaintiffs in an amount to be determined at trial, but not less than $100,000.

Count Five – Quantum Meruit
(Against All Defendants)

82. The Plaintiffs restate and re-allege the foregoing paragraphs of this Complaint as if fully set forth herein.

83. For nine months, the Plaintiffs tirelessly worked on helping to secure investors for the Defendants.

84. The Defendants called on the Plaintiffs on multiple occasions to take actions to consummate the investment. Over nine months, the Plaintiffs spent a substantial amount of their time and personal resources to find and develop PNC and additional prospective investors for the Defendants.

85. The Defendants promised, and the Plaintiffs expected to be paid, a two percent commission for their efforts. The Plaintiffs reasonably relied on the Defendants' promises because the Defendants repeatedly assured them of payment and a two percent commission is a typical "finder's fee" for individuals who secure investments in private equity or hedge funds.

86. The Defendants' breach of this promise has damaged the Plaintiffs in an amount to be determined at trial, but not less than $100,000.

Count Six – Fraud
(Against All Defendants)

87. The Plaintiffs restate and re-allege the foregoing paragraphs of this Complaint as if fully set forth herein.

88. On multiple occasions, from the Fall of 2012 to the Summer of 2013, the Defendants told the Plaintiffs that they would receive a two-percent commission of the investment made by any investor the Plaintiffs' introduced to the Defendants.

89. The Defendants' knew that their representations to pay the Plaintiffs were false or made recklessly without knowledge of their truth, when made, as the Defendants did not intend to, and in fact did not, pay the Plaintiffs for their services.

90. The Defendants made these false and reckless statements to induce the Plaintiffs to find investors for the Defendants.

91. In reliance on the Defendants' false or reckless statements, the Plaintiffs provided the Defendants numerous prospective investors and spent considerable time and resources to secure investors for the Defendants.

92. The Plaintiffs reasonably relied on the Defendants' false or reckless statements because the Defendants' repeatedly assured the Plaintiffs they would be paid for their services and a two-percent commission is a typical "finder's fee" for such fund-raising efforts.

93. As a result of the Defendants' fraudulent or reckless representations, the Plaintiffs have been damaged in an amount to be determined at trial, but not less than $100,000.

<u>Count Seven</u> – <u>Connecticut Unfair Trade Practices Act</u>
*Conn. Gen. Stat. § 42-110b*
(Against All Defendants)

94. The Plaintiffs restate and re-allege the foregoing paragraphs of this Complaint as if fully set forth herein.

95. Through their chosen professions, the Plaintiffs have acquired and developed business contacts, client lists, goodwill, and relationships of trust and confidence with numerous individual and entities who could potentially invest in hedge funds.

96. For nine months, the Plaintiffs worked to secure prospective investors, and to develop PNC as an investor, by using the Plaintiffs' business contacts, client lists, goodwill, and pre-existing relationships of trust and confidence for the Defendants.

97. The Defendants engaged in the unfair acts or practices alleged herein when they misappropriated and exploited the Plaintiffs' labor, business relationships, client lists, and goodwill to raise funds for the Defendants.

98. The Defendants acted in bad faith by falsely or recklessly promising to compensate the Plaintiffs for their efforts, but subsequently refusing to do so. The Defendants' conduct is unethical, oppressive, unscrupulous and immoral.

99. The Defendants knew that their conduct was unfair and deceptive.

100. As a result of the Defendants' unfair trade practices and commercially immoral conduct, the Plaintiffs have been damaged in an amount to be determined at trial, but not less than $100,000.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs demand the following relief:

A. Compensatory damages in an amount to be determined at trial, but in an amount not less than $100,000.

B. Punitive damages for the Defendants' intentional and malicious misconduct in an amount to be determined at trial, but in an amount not less than $100,000.

C. A declaratory judgment declaring that the Defendants are obligated to pay the Plaintiffs a two-percent commission on all investments and capital commitments made to the Defendants from investors introduced or sourced by the Plaintiffs or PNC, including, but not limited to, all investments that PNC will make, facilitate, or cause to be made in the Defendants' fund;

D. Awarding Plaintiffs prejudgment and post judgment interest, and attorneys' fees and costs; and

E. Granting any such other and further relief as is deemed just and proper by the Court.

Dated: September 26, 2013

**REED SMITH LLP**

By: ______/s/__________

James M. Andriola (ct22742).
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 521-5400
Fax: (212) 521-5450

James H. Bicks (ct04729)
Wiggin and Dana LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 363-7600
Fax: (203) 363-7676